# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

WILLIAM BRYANT WHEELER,

           Defendant.

CRIMINAL CASE NO.

1:15-CR-00390-MHC-JFK

## ORDER AND REPORT AND RECOMMENDATION

Pending before the court is Defendant Wheeler's motion [Doc. 46] to suppress evidence, particularly the IP address for his computer, obtained as the result of the execution of a federal search warrant [Doc. 46-1 ("E.D. Va. Search Warrant Application")] authorized by Magistrate Judge Theresa Carroll Buchanan in the Eastern District of Virginia.  Following the execution of that search warrant, agents with the Federal Bureau of Investigation ("FBI") obtained a federal search warrant [Doc. 46-3 ("N.D. Ga. Search Warrant & Application")] authorized by Magistrate Judge Alan J. Baverman in this District for Defendant's residence and the electronic devices found therein.  Defendant, accordingly, also seeks to suppress the fruits of the execution of the Eastern District of Virginia warrant, that is, the evidence seized during the search

of his residence and electronic devices and his statement.[1]  [Doc. 46].  The Government

opposes the motion to suppress.  [Doc. 65].

Also pending before this court is Defendant's motion [Doc. 45] to dismiss the

indictment for outrageous government misconduct and Defendant's second [Doc. 55]

motion to compel discovery.  The Government also opposes [Doc. 65] the motion to

dismiss and to compel discovery.

Based on the evidence seized and Defendant's statements, the Government

sought an indictment of Defendant for violation of 18 U.S.C. § 2252(a)(2) and (b)(1),

involving his knowing receipt of at least one visual depiction of a minor engaging in

sexually explicit conduct, "said depictions having been (a) produced using minors

engaging in sexually explicit conduct, and (b) shipped and transported in and affecting

interstate and foreign commerce . . . ."  [Doc. 8, Count One].  Defendant is also charged

with a violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2), involving his possession of

at least one computer and computer storage device containing at least one visual

depiction of a minor engaging in sexually explicit conduct, "said depiction having been

---

[1]Defendant does not otherwise seek suppression of the evidence obtained as a result of the execution of the search warrant obtained in this District, that is, he does not challenge the lawfulness of that search warrant and does not otherwise seek suppression of his statements to law enforcement.  [Doc. 46].

(a) produced using minors engaging in sexually explicit conduct, (b) involving at least one prepubescent minor and at least one minor who not attained 12 years of age, and (b) having been shipped and transported in and affecting interstate and foreign commerce . . . ." [Id., Count Two]. Defendant entered a plea of guilty on March 11, 2016. [Doc. 30]. However, Defendant was allowed to withdraw his guilty plea in order to pursue the instant motions to suppress and dismiss. [Doc. 43].

## **Motion to Suppress**

The basis for Defendant's motion to suppress resulting from authorization of and execution of the search warrant in the Eastern District of Virginia has been the subject of numerous decisions across the country over the last two years. See United States v. Barnes, No. 3:15-CR-112-J-39PDB, Doc. 83, at 27-29 & n.18-20 (M.D. Fla. May 8, 2017) (recommending denial of the motion to suppress and listing district court decisions as of that date).[2] Each of the arguments offered by Defendant Wheeler in support of his motion to suppress and argued by the Government in opposition thereto have been the subject of extensive legal analysis by the courts addressing the arguments presented herein.

_____

[2]The following decision has been entered since May 8, 2016: United States v. Hernandez-Cuellar, 2017 WL 2297171 (E.D. Tex. May 26, 2017) (adopting report and recommendation that motion to suppress be denied).

3

Specifically, in this case, Defendant contends that Magistrate Judge Buchanan

in the Eastern District of Virginia lacked authority under 28 U.S.C. § 636[3] and Fed. R.

Cr. P. 41(b)[4] to sign the NIT search warrant and that, therefore, the search warrant was

void *ab initio*, making the search resulting in the seizure of his IP address warrantless

---

[3]Section 636(a) of the Federal Magistrates Act provides in pertinent part, "Each United States magistrate judge serving under this chapter shall have *within the district* in which sessions are held by the court that appointed the magistrate judge . . . (1) all powers and duties conferred or imposed . . . by law or by the Rules of Criminal Procedure." 28 U.S.C. § 636(a) (emphasis added).

[4]Authority to issue search warrants by magistrate judges, as stated at the time the Eastern District of Virginia search warrant issued, is contained within Fed. R. Cr. P. 42(b), which provides in pertinent part:

> (1) a magistrate judge with authority in the district . . . has authority to issue a warrant to search for and seize a person or property located within the district;
>
> (2) a magistrate judge with authority in the district has authority to issue a warrant to search for and seize a person or property outside the district if the person or property is located within the district when the warrant is issued but might move or be moved outside the district before the warrant is executed; . . . and
>
> (4) a magistrate judge with authority in the district has authority to issue a warrant to install within the district a tracking device; the warrant may authorize use of the device to track the movement of a person or property located within the district, outside the district, or both . . . .

Fed. R. Cr. P. 41(b)(1), (2) and (4).

4

under the Fourth Amendment and requiring suppression of his IP address and of all the fruits of subsequent searches.  [Doc. 46 at 14-24].  Alternatively, Defendant contends that, if the authorization of the search warrant did not constitute a constitutional violation of Rule 41(b) but only a technical violation, suppression is nonetheless required because the Rule 41(b) violation was prejudicial and intentional and deliberate. [Id. at 24-33].   In response, the Government contends that Magistrate Judge's authorization of the NIT search warrant did not violate Rule 41(b) or, in the alternative, that any violation was merely technical and does not require suppression.  [Doc. 65 at 21-38].  The Government also argues that the good faith exception to the exclusionary rule applies and that the evidence seized should not be suppressed.  This is the result reached by every court (with the exception of five) considering similar motions to suppress, regardless of whether the court found no Rule 41(b) violation or found a constitutional or technical violation of Rule 41(b).  [Id. at 41-44].  In reply, Defendant repeats many of the arguments previously made and, for the first time, briefly addresses - relying on arguments presented in other cases - why the good faith exception is not applicable in this case.  [Doc. 66].  And, although the Government did not challenge Defendant's legitimate expectation of privacy to attack the lawfulness of the Eastern District of Virginia search warrant or the seizure of the IP address, both parties address

his privacy interests.  [Doc. 46 at 27-30; Doc. 63 at 11-12; Doc. 65 at 34-35; Doc. 66 at 8-9].  The court will briefly address that issue.

## I.      Statement of Facts and Procedural Background

As is true of the arguments made in support of and opposition to the motion to suppress in this case, the background facts and procedural history set forth in each prior court decision is generally agreed upon and not in dispute.  In this case, the background information set forth by Defendant and the Government in their briefs is, likewise, generally in line with that previously set forth with the exception of the specific information pertaining to the search warrant obtained for Defendant Wheeler's residence.  [Doc. 46 at 3-14; Doc. 65 at 5-17].  Additionally, Defendant requested a hearing to present evidence from a computer science expert, Matthew Miller, concerning the operation of the internet and the computer systems involved in this case. The court granted the hearing.  In addition to the testimony of Dr. Miller, the Government offered the testimony of Special Agent Daniel Alfin, FBI, the national case agent for the investigation resulting in the indictment of Defendant Wheeler.[5]  [Doc.

_____

[5]Defendant and the Government also presented the testimony of these two witnesses with respect to Defendant's motion to compel discovery which will be addressed *infra*.

6

61].[6]  The testimony of Dr. Miller and Agent Alfin as to the operation of the internet, the computer systems involved and network investigative technique employed resulting in the identification of Defendant's IP address does not materially differ from the information set forth in prior decisions or from Defendant's and the Government's accounts in the briefs in this case.

Taking into account the briefs filed in this case, the testimony at the hearing and the factual outline set forth in prior cases addressing the issues raised herein, the following statement of background facts and procedural history, as tailored for this case, is modified by this court from the facts and background information in United States v. Taylor, _ F. Supp. 3d _, _, 2017 WL 1437511, at **1-3 (N.D. Ala. April 24, 2017), and United States v. Adams, 2016 WL 4212079, at *1 (M.D. Fla. August 10, 2016).

The charges against Defendant Wheeler arise from the FBI's investigation into a website known as "Playpen," which is a global online forum dedicated to the advertisement and distribution of child pornography.  Users visit Playpen via the anonymous Tor network which is constructed to mask the user's IP address by relaying

---

[6]Citations to transcript:  (Tr. at ).

the user's communication among multiple servers located worldwide.[7]   A server receiving a query from a Tor network displays the IP address of the "guard" node in the Tor network and prevents law enforcement from tracing the communication back through the network to the actual user, in this case, Defendant Wheeler.  This also prevents the Government from subpoenaing the Internet Service Provider ("ISP") - the entity assigning the IP address to the user's internet service - to locate the user's physical address.

The Playpen website, accessible only on the Tor network, was a "hidden service," that is, not searchable through Google or other search engines.  Instead, a user must employ the Tor software and know the exact address of a particular hidden service to access it.     Tor obscures the IP address of a hidden service, meaning that law enforcement cannot determine the location of the computer hosting a hidden service. The Playpen website was listed on a Tor hidden service page dedicated to pedophilia and child pornography.  The administrator of Playpen periodically moved the website from one Uniform Resource Locator ("URL") to another, in part, to avoid detection by

---

[7]The Tor software permits a user to access the Tor network which obscures the identity of users by rerouting a user's IP address through layers of relay points, so that the IP address at which the signal exits, identified by Agent Alfin as the "guard" node (Tr. at 52-53), is not the IP address at which the signal originated and making it impossible to peel back the layers of the onion to discover the originating address.

8

law enforcement.  Upon logging into the website, a user is immediately directed to a Playpen directory that lists message boards divided into more than fifty topic and sub-topics largely referring to child pornography, child erotica and child sexual abuse.

On or about February 20, 2015, after receiving a tip from a foreign law enforcement agency, the FBI discovered Playpen's website host's IP address in North Carolina and seized a copy of the server containing the Playpen website which was then stored on a server located in the Eastern District of Virginia.  The FBI operated the server assuming administrative control of Playpen.  Because traditional methods of obtaining IP addresses would only reveal the "guard" node IP addresses of users accessing Playpen, the FBI sought and received authorization from Magistrate Judge Buchanan to deploy a Network Investigative Technique ("NIT") from the server in Virginia to locate and identify Playpen users.  When a user accessed Playpen via the Tor network and accessed a post in a forum containing sexually explicit child pornography, the NIT was transmitted back to the user's computer (running in the background and undetectable to the user (Tr. at 33)), identified the IP address and other operating system information, and transmitted that information back to a different government operated server which collected and logged the information.  The application for the search warrant authorizing deployment of the NIT requested

9

permission to deploy the NIT to "cause an activating computer-wherever located-to send to a computer controlled by or known to the government, network level messages containing information that may assist in identifying the computer, its location, [and] other information about the computer and the user of the computer." [E.D. Va. Search Warrant Application ¶ 46(a)].[8]  Because the NIT software or code was inserted into the Playpen website located in the Eastern District of Virginia (Tr. at 17), the search warrant was sought in that District.

Using the information generated by the NIT, agents determined that, on February 25, 2015, the user "HellRaiser," from IP address 50.241.30.145, logged into the Playpen website and accessed various posts and links relating to child pornography. [N.D. Ga. Search Warrant Application ¶ 27-31].[9]  FBI agents determined that the IP address was operated by ISP Comcast Cable.  In response to an administrative subpoena, Comcast Cable provided information on the user of that IP address: "Pretty Little Stitches (Attn Faye Wheeler) is receiving internet service at the address of the

---

[8]Although the search warrant authorized deployment of the NIT for thirty days, the FBI ceased to operate Playpen on March 4, 2015.  [N.D. Ga. Search Warrant Application ¶ 11].

[9]According to logs on the Playpen website, user "HellRaiser" originally registered an account on December 22, 2014.  [Id. ¶¶ 25-26].

AO 72A
(Rev.8/82)

[residence to be searched] . . . ."  [Id. ¶¶ 32-33].  Additional investigation identified Defendant as Faye Wheeler's husband.  [Id. ¶ 45].  On October 21, 2015, Magistrate Judge Baverman issued a search warrant for Defendant's residence and electronic devices found therein.  [N.D. Ga. Search Warrant].  As a result of execution of the search warrant, over 1800 images of child pornography were seized from Defendant's electronic devices and his computer, and Defendant also stated that he was the user "HellRaiser" who logged into the Playpen website.  (Tr. at 40-41).

Additional facts will be set forth as necessary during discussion of the motion to suppress.

## II.    Discussion

### a.    Legitimate Expectation of Privacy

As noted, the Government did not place Defendant on notice that he had to establish a legitimate expectation of privacy to challenge the Eastern District of Virginia search warrant.  However, Defendant contends that, because the NIT deployed into his computer and seized information, such as his IP address, transmitting that information back to the government controlled server, his privacy interests are impacted by execution of the NIT search warrant.  [Doc. 46 at 27-30; Doc. 63 at 11-12].  In response, the Government focuses on the information seized, the IP address, contending

AO 72A
(Rev.8/82)

that Defendant does not have a legitimate expectation of privacy in the IP address which is assigned by and owned by the third party ISP provider.  [Doc. 65 at 34-35].

To determine whether an individual may challenge a search, the court must decide "whether the individual maintains a legitimate expectation of privacy in the object of the search."  United States v. Hastamorir, 881 F.2d 1551, 1559 (11th Cir. 1989).  It is each Defendant's burden to prove that he has a legitimate expectation of privacy in the place searched, in this case, his computer.  See United States v. Cooper, 203 F.3d 1279, 1283-84 (11th Cir. 2000).  Making this determination involves a two-part inquiry:  (1) "whether the individual has manifested 'a subjective expectation of privacy in the object of the challenged search[,]' . . . [and (2)] whether society is willing to recognize the individual's expectation of privacy as legitimate."  Hastamorir, 881 F.2d at 1559 (citation omitted).  Thus, "'in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable. . . .'"  United States v. Chaves, 169 F.3d 687, 690 (11th Cir. 1999) (citation omitted).

The Government's focus on the type of information seized, the IP address, misses the point.  The Government is correct that "[l]ower courts uniformly agree that, because of the third party doctrine, computer users lack a reasonable expectation of privacy in

AO 72A
(Rev.8/82)

their IP addresses, subscriber information, and similar descriptive information they disclose to third parties (such as ISPs) to facilitate Internet service." <u>Taylor</u>, 2017 WL 1437511, at *6 (listing cases).  However, the issue in this case is not what information was seized but the location of the seizure.  There is no dispute that the NIT was deployed into the software on Defendant's computer in order to capture and transmit the IP address back to the FBI logging server.  Also, there is no dispute that Defendant Wheeler utilized Tor software to connect to the Playpen website thereby obfuscating his IP address.

As the court in <u>Taylor</u> found, this court finds that Defendant Wheeler not only displayed a subjective expectation of privacy in the IP address, because he employed the Tor software to conceal it from the public, <u>Id.</u>, at *7, but that he had an objectively reasonable expectation of privacy "that his computer's contents would remain private[,]" <u>Id.</u>  This court agrees with the court in <u>Taylor</u> that "given the nature of the Tor program, the Government could discover the information seized here *only* by entering [Defendant Wheeler's] personal computer through a back door-only by taking over the website itself. . . .  [A]lthough [Defendant] may not have had a reasonable expectation in the privacy of his IP address in the abstract, he did have a reasonable expectation of privacy in information that could be gleaned only from his computer."

13

Id., at *8 (emphasis in original).  And see United States v. Darby, 190 F. Supp. 3d 520, 528-30 (E.D. Va. 2016); United States v. Vortman, 2016 WL 7324987, at **6-7 (N.D. Cal. December 16, 2016); but see United States v. Acevedo-Lemus, 2016 WL 4208436, at **4-6 (C.D. Cal. August 8, 2016).

The court finds that Defendant can challenge the NIT search warrant issued in the Eastern District of Virginia resulting in the deployment of the NIT into his personal computer.

### b.   Good Faith

As noted *supra*, with the exception of five district courts, every court that has considered the challenge to the NIT search warrant, that is, whether the issuance of the warrant exceeded the authority of the magistrate judge pursuant to Rule 41(b) and § 636, has concluded that, even if Rule 41(b) and/or § 636 were violated, the good faith exception to the exclusionary rule should be applied and the motions to suppress should be denied.  Barnes, No. 3:15-CR-112, Doc. 83 at 27-29 & n.18-20.[10]  The court finds persuasive the approach of the district court in United States v. Schuster, 2017 WL 1154088 (S.D. Ohio March 28, 2017), and the recommendation of the magistrate judge in Barnes that, under the circumstances, judicial economy is best served by first turning

_____

[10]And see footnote 2.

14

to the issue of whether the good faith exception is applicable.  See Schuster, 2017 WL 1154088, at *4 ("Before deciding whether a Fourth Amendment violation occurred, the Court may choose to determine first whether the exclusionary rule applies.  [C]ourts could reject suppression motions posing no important Fourth Amendment questions by turning immediately to a consideration of the officers' good faith. . . . .  Whether it is necessary to address the Fourth Amendment question posed in a particular case is within the informed discretion of the Court.") (citation and internal quotation marks omitted); Barnes, No. 3:15-CR-112, Doc. 83 at 29 ("In the interest of judicial economy, without the need to guide law enforcement given Rule 41(b)'s recent amendment, and with focus on the most straightforward issue, [the court] recommend[s] without deciding former Rule 41(b) did not authorize the NIT warrant, assuming without deciding Judge Buchanan acted beyond powers the Federal Magistrate Act confers, assuming without deciding a resulting unconstitutional search and seizure occurred, and deciding only whether the good-faith exception to the exclusionary rule applies.").  This approach is particularly appropriate in this case, given the change, as referenced by the magistrate judge in Barnes, in Rule 41(b) since the NIT search warrant was issued.

Effective December 1, 2016, subsection (6) was added to Rule 41(b).  The amended provision states:

15

(b)  Venue for a Warrant Application.  At the request of a federal law enforcement officer or an attorney for the government: . . .

(6)  a magistrate judge with authority in any district where activities related to a crime may have occurred has authority to issue a warrant to use remote access to search electronic storage media and to seize and copy electronically stored information within or outside that district if:
    (A)  the district where the media or information is located has been concealed through technological means; or
    (B)  in an investigation of a violation of 18 U.S.C. § 1030(a)(5), the media are protected computers that have been damaged without authorization and are located in five or more districts.

Fed. R. Cr. P. 41(b)(6) (amended December 1, 2016).  Given the amendment to Rule 41(b), the alleged violation of Rule 41(b) in this case - and the other Playpen generated cases - is not capable of reoccurring and suppression of the results of the search of Defendant Wheeler's residence lacks much, if any, deterrence value.  See Schuster, 2017 WL 1154088, at *4 ("[W]hile Defendant's motion to suppress poses a complex and multi-faceted series of technical questions, the resolution of which has perplexed district courts across the country, the underlying issue has been entirely resolved by amendment of the Federal Rules of Criminal Procedure. . . .  Therefore, the Court finds that resolution of the Fourth Amendment issues serves no value to Fourth Amendment jurisprudence, as the potential risk of harm is no longer capable of repetition.") (citation omitted; emphasis deleted).

16

In <u>United States v. Leon</u>, 104 S. Ct. 3405 (1984), and <u>Massachusetts v. Sheppard</u>, 104 S. Ct. 3424 (1984), the Supreme Court established a good faith exception to the exclusionary rule where officers placed reasonably objective reliance on a search warrant later determined to be defective.  Recently, in <u>Herring v. United States</u>, 129 S. Ct. 695 (2009), the Supreme Court affirmed these decisions stating, "The fact that a Fourth Amendment violation occurred-i.e., that a search or arrest was unreasonable-does not necessarily mean that the exclusionary rule applies."  <u>Id.</u> at 700; <u>and see</u> <u>Schuster</u>, 2017 WL 1154088, at *5 ("the Supreme Court has repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation" and has "not[ed] that exclusion has always been our last resort, not our first impulse") (quoting <u>Herring</u>, 129 S. Ct. at 700) (internal quotation marks omitted; emphasis deleted); <u>Barnes</u>, No. 3:15-CR-112, Doc. 83 at 30 ("The Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands.") (citation and internal quotation marks omitted).

In <u>United States v. Accardo</u>, 749 F.2d 1477 (11th Cir. 1985), the Eleventh Circuit Court of Appeals discussed the good faith exception established by the Supreme Court. With the exception of cases "where the issuing magistrate wholly abandoned his judicial role[,]" or where "a warrant [is] based on an affidavit 'so lacking in indicia of

17

probable cause as to render official belief in its existence entirely unreasonable[,]'" or where "a warrant may be so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid[,]" the good faith exception applies. Id. at 1480 & n.4 (citations omitted). The good faith exception "require[s] suppression 'only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.'" Id. at 1480 (quoting Leon, 104 S. Ct. at 3422). In making this decision, the totality of the circumstances surrounding issuance of the search warrant may be considered. Id. at 1481. The Government "has the burden of demonstrating the good-faith exception to the exclusionary rule applies." Barnes, No. 3:15-CR-112, Doc. 83 at 34 (citing United States v. Robinson, 336 F.3d 1293, 1297 (11th Cir. 2003)). The only exception potentially applicable to Defendant's contention that the good faith exception does not apply in this case would be that the warrant was "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." Accardo, 749 F.2d at 1480 & n.4 (citations omitted).

"The purpose of the exclusionary rule is not to redress the injury to the privacy of the search victim[;] . . . [i]nstead, the [exclusionary] rule is a judicially created

AO 72A
(Rev.8/82)

remedy designed to safeguard Fourth Amendment rights generally through its deterent effect[,] . . . [that is,] [t]he rule is calculated to prevent, not repair." <u>Schuster</u>, 2017 WL 1154088, at *5 ("the prime purpose of the exclusionary rule is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures") (citations and internal quotation marks omitted); <u>and see</u> <u>Barnes</u>, No. 3:15-CR-112, Doc. 83 at 33-34 ("the [exclusionary] rule is not an individual right and applies only if suppression results in 'appreciable deterrence'" which "must outweigh the 'substantial social costs'-imposing a 'costly toll upon truth-seeking' and 'letting guilty and possibly dangerous defendants go free'") (citation omitted).  In this regard, "'the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.'" <u>Schuster</u>, 2017 WL 1154088, at *5 (citation omitted; emphasis deleted); <u>and see</u> <u>Barnes</u>, No. 3:15-CR-112, Doc. 83 at 34 (same).

Furthermore, "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates[,]" for this reason, the rule is not applicable when an officer's reliance on a judge's issuance of a warrant is objectively reasonable.  <u>Schuster</u>, 2017 WL 1154088, at *6 ("[A] warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in

19

conducting the search.") (citation and internal quotation marks omitted; emphasis deleted); Barnes, No. 3:15-CR-112, Doc. 83 at 34 (same). Accordingly, "[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his [or her] judgment that the form of the warrant is technically sufficient . . . [and] [p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations[; therefore,] evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." Schuster, 2017 WL 1154088, at *6 (citations and internal quotation marks omitted).

Defendant Wheeler, as is true of other defendants challenging applicability of the good faith exception, contends that the affiant to the NIT search warrant, as well as the affiant to the Northern District of Georgia search warrant, should have known that the search warrant was facially deficient, that is, that the federal magistrate judge issuing the NIT search warrant did not have authority under Rule 41(b) or the Federal Magistrate Judge's Act to issue the warrant to allow searches of computers outside of that district. [Doc. 66 at 15-16]. To establish the affiant's deliberate disregard of Rule 41, Defendant relies on the Department of Justice ("DOJ") manual published in 2009

20

which advised when multiple search warrants should be obtained ostensibly under circumstances like that facing the FBI in the Playpen investigation.  [Id. at 11-12]. Defendant also points to a decision in Southern District of Texas, In re Warrant to Search a Target Computer at Premises Unknown, 958 F. Supp. 2d 753 (S.D. Tex. 2013), in which a district court declined to authorize a warrant[11] and that resulted in the DOJ sending a letter to the Advisory Committee on Criminal Rules to seek the aforementioned amendment to Rule 41(b).  [Id. at 12-13 (citing September 18, 2013, letter from Acting Attorney General Mythili Raman ("Raman letter"))].  Based on these facts, Defendant contends that "the DOJ and FBI were well aware that NIT warrants to infiltrate computers in unknown locations ran afoul of Rule 41(b), and they proceeded anyway."  [Id. at 16].  Defendant's arguments, as has been found by other courts, are not persuasive.

In Schuster, the district court rejected the defendant's argument that the agents should have been aware that the NIT warrant was not authorized under Rule 41 because of the Raman letter to the Advisory Committee seeking the rule amendment.  2015 WL

---

[11]As pointed out by a number of courts, the facts in the Southern District of Texas case are readily distinguishable from those presented by execution of the NIT search warrant.  See, e.g., United States v. Hart, No. 2:16-CR-110-FtM-29CM, Doc. 50 at 24-25 (M.D. Fla. April 27, 2017).

AO 72A
(Rev.8/82)

1154088, at *7.  This court agrees with the <u>Schuster</u> court's statement, "The Court finds it entirely unreasonable to hold agents to such a standard of knowledge.  Indeed, if *anyone* should have been charged with such specific legal knowledge, it would have been the magistrate judges, not the agents."  <u>Id.</u> (emphasis in original).[12]  This court reaches the same conclusion with respect to the DOJ manual provision pointed out by Defendant.[13]

_____

[12]In <u>United States v. Kneitel</u>, No. 8:16-CR-23-T-35JSS, Doc. 158 (M.D. Fla. January 3, 3017), the court likewise rejected this argument regarding the Raman letter.  In that case, the court obtained information from Agent Alfin that Ms. Raman was Acting Assistant Attorney General for the Criminal Division of DOJ from March 2013 to March 2014, leaving the DOJ before the FBI began the investigation of the Playpen website.  <u>Id.</u> at 3-4.  Because the record presented no evidence that any agent involved in the Playpen investigation took part in the request to amend Rule 41, that court found "that the pendency of the proposed amendment during the time the FBI applied for the NIT warrant does not prohibit the application of the good faith exception."  <u>Id.</u> at 4; <u>and see</u> <u>Hart</u>, No. 2:16-CR-110, Doc. 50 at 26-27 (same).

[13]The court also notes that neither the Raman letter nor the DOJ manual "create any enforceable substantive rights" that Defendant may rely upon.  <u>United States v. Taghon</u>, 2016 WL 5247923, at *4 (N.D. Ind. September 21, 2016).  Such letters, memos and policy are "'intended solely as a guide to the exercise of investigative and prosecutorial discretion,'" and "DOJ memos ought not be given great weight because they do not announce 'final decision[s]'" and because "the DOJ 'may well revise its analysis' in light of new information or changed circumstances."  <u>United States v. Christie</u>, 825 F.3d 1048, 1060 (9th Cir. 2016) (citations omitted); <u>and see</u> <u>United States v. Peterson</u>, 2008 WL 4224813, at **6-7 (M.D. Ga. September 5, 2008) (rejecting the defendant's reliance on a DOJ policy as grounds for suppression noting that the DOJ "may give such weight as it chooses to its internal rules" and that the DOJ "has the primary, if not the sole, authority to enforce" its policies) (citation and internal

More persuasive, however, is the fact that, besides the magistrate judge in the Eastern District of Virginia determining that she had authority to issue the warrant, "the sheer number of agents who have relied upon the NIT warrant, and obtained subsequent warrants from magistrate judges in their own jurisdictions[, such as, Magistrate Judge Baverman issuing the search warrant for Defendant's residence], as well as the inconsistent rulings by district courts across the country, shows that no aspect of the NIT warrant's validity constitutes a simple question nor a close call. Accordingly, it is unreasonable to expect either the EDVA agent or the [Northern District of Georgia] agent to have concluded, contrary to the findings of the magistrate judges, that the NIT warrant was invalid." Schuster, 2017 WL 1154088, at *7 (emphasis deleted); and see Hernandez-Cuellar, 2017 WL 2297171, at *8 (the court declined the defendant's request for an evidentiary hearing to question the NIT search warrant affiant about his and the prosecutor's beliefs "regarding the legality of the NIT Warrant" because that information "would not answer the central question, namely what the objective, reasonably well-trained officer would have known about Rule 41(b)'s reach at the time" - neither "the DOJ's and/or FBI's subjective beliefs about" what Rule 41(b) authorized "impact[s] the good-faith exception analysis" and noting that the "very fact that courts

_____

quotation marks omitted).

AO 72A
(Rev.8/82)

have split on the question [of validity of the NIT warrant] demonstrates that a reasonably well-trained officer could have concluded that the NIT Warrant issued lawfully"); Barnes, No. 3:15-CR-112, Doc. 83 at 35-36 ("That Judge Buchanan determined she had authority to issue the warrant-plus that courts in more than a dozen other cases concur-resolves that the presumption was objectively reasonable.").

Given the agents' reasonable reliance on the determination of Magistrate Judge Buchanan to issue the NIT warrant and of Magistrate Judge Baverman to issue the warrant in this District, the potential societal harm resulting from suppression of evidence seized in this case from Defendant's residence and electronic devices is simply not outweighed by any deterrence value - in fact, "because Rule 41(b)(6) now specifically permits the use of the NIT, any need for deterrence is eliminated." Hart, No. 2:16-CR-110, Doc. 50 at 30.  The court in Kneitel, No. 8:16-cr-23, Doc. 158, succinctly and persuasively applied the balancing test under the circumstances before that - and this - court.

> [T]here is no indication that the agents acted in flagrant disregard of Rule 41 in seeking approval of the warrant or otherwise acted unreasonably in relying on the magistrate judge's independent determination that the court had authority to issue the warrant.  Under these circumstances, the substantial cost to society of potentially allowing thousands of culpable defendants go free cannot be outweighed by the marginal deterrence, if any, that would result from suppression.  Indeed, the Court finds that even

the cost of allowing this single defendant to go free-an individual who had been admittedly viewing and downloading child pornography for more than a decade and had a collection of over 700 images and 500 videos depicting the sexual abuse and exploitation of children-would far outweigh the benefit of preserving the precise adherence to a complicated and imprecise Rule application, *especially* where the Rule has now been modified and the occurrence is not likely to be repeated.

Id. at 6 (emphasis added); accord United States v. Lueck, No. 6:17-CR-8-Orl-41KRS, Doc. 56 at 19-20 (M.D. Fla. April 12, 2017) (citing this language in support of finding that the good faith exception applies).

Before concluding the discussion of the applicability of the good faith exception, the court will briefly address the grounds relied on by the five courts, and by Defendant who is relying on those decisions, finding that the Eastern District of Virginia search warrant was void *ab initio* and that, for that reason, the good faith exception does not apply. [Doc. 46 at 22-24; Doc. 66 at 15-16]. Defendant's argument that, because Magistrate Judge Buchanan lacked authority under § 636 and Rule 41(b) to issue a search warrant allowing the NIT to be deployed into computers located outside the Eastern District of Virginia, the search warrant was void *ab initio* and, therefore, the deployment of the NIT constituted a warrantless search, is not persuasive. [Doc. 56 at 22-23 (citing United States v. Levin, 186 F. Supp. 3d 26, 35-36 (D. Mass. 2016))]. Contrary to Defendant's argument, Magistrate Judge Buchanan "had the authority to

issue search warrants-that is, the inherent power to do so." <u>Adams</u>, 2016 WL 4212079,

at *6; <u>and see</u> <u>Lueck</u>, No. 6:17-CR-8, Doc. 56 at 14-15, 18-19 (same); <u>Barnes</u>, No.

3:15-CR-112, Doc. 83 at 37 (discussing the defendant's argument that the search

warrant was void *ab initio*, the court noted that "the warrant was inarguably valid *ab*

*initio* at least regarding activating computers in the Eastern District of Virginia"). And,

even if that search warrant was determined to be void *ab initio*, this court finds

persuasive the decisions of courts rejecting the argument that the good faith exception

automatically does not apply in such a situation.

This court finds persuasive the district court's reasoning in <u>Lueck</u> rejecting this

argument.

> [E]ven if the NIT warrant was void *ab initio*, the Court would still
> disagree with Defendant's position.  Defendant relies, in part, on <u>United</u>
> <u>States v. Levin</u> to support the proposition that the good-faith exception is
> not available when a warrant is issued without jurisdictional authority.
> However, "<u>Levin</u> has been subsequently called into question, primarily
> because it relies on a Sixth Circuit opinion, <u>United States v. Scott</u>, 260
> F.3d 512, 515 (6th Cir. 2001), that was effectively overruled in <u>United</u>
> <u>States v. Master</u>, 614 F.3d 236 (6th Cir. 2010)." . . .  Additionally, despite
> Defendant's argument that the <u>Leon</u> Court never suggested that the good-
> faith exception applies where the judicial officer lacked authority to issue
> the warrant, several courts have held that the good faith exception is not
> foreclosed where a warrant that is void *ab initio* is issued. . . .
> Furthermore, "there is no authority from the Eleventh Circuit suggesting
> that the good faith exception is wholly foreclosed under these
> circumstances."

26

Lueck, No. 6:17-CR-8, Doc. 56 at 19 (quoting Kneitel, No. 8:16-CR-23, Doc. 158 at

2; citing United States v. Anzalone, 2016 WL 5339723, at *11 (D. Mass. October 28,

2016)); and see Taylor, 2017 WL 1437511, at **15-16 (although finding that the search

warrant was void *ab initio*, the court concluded that the good faith exception applied

because "'[a] magistrate judge's mistaken belief that she had jurisdiction, absent any

indicia of reckless conduct by the agents, does not warrant suppression'") (quoting

United States v. Werdene, 188 F. Supp. 3d 431, 453 (E.D. Penn. 2016)); Schuster, 2017

WL 1154088, at *8 (rejecting the defendant's reliance on the Sixth Circuit's decision

in Scott of a "categorical foreclosure of the good-faith exception[,]" based on the

subsequent decision in Master, and holding that the exception "is not rendered

automatically inapplicable simply because law enforcement officers relied upon a

warrant that is subsequently found to be void *ab initio*"); Barnes, No. 3:15-CR-112,

Doc. 83 at 37-38 (distinguishing cases relied on by that defendant [and by Defendant

Wheeler] and rejecting the defendant's argument that the good faith exception is not

applicable to a warrant found to be void *ab initio* - "the argument finds no support in

the Supreme Court's exclusionary-rule jurisprudence and appears to conflict with it to

the extent it conflates violation and remedy or requires suppression without weighing

the costs and benefits").

27

Accordingly, the court finds that, even if the search warrant in the Eastern District of Virginia was issued in violation of the magistrate judge's authority under the Federal Magistrate Judge's Act and exceeded her authority under Rule 41(b), as allowed at that time, the good faith exception to the exclusionary rule applies because the agents reasonably relied on the magistrate judges' issuance of the NIT search warrant and the search warrant for Defendant's residence and electronic devices.

### c.    Conclusion

For these reasons and relying on the cited authority, the court **RECOMMENDS** that Defendant's motion [Doc. 46] to suppress be **DENIED**.

### Motion to Dismiss

Defendant seeks dismissal of the indictment pursuant to Fed. R. Cr. P. 12(a)(3) and the court's supervisory powers based on alleged outrageous government misconduct in operating the Playpen website from February 20, 2015, to March 4, 2015. [Doc. 45]. Defendant contends that the Government's operation of the website allowed the distribution of child pornography on an unprecedented scale for no justifiable reason. Defendant contends that during the Government's operation of the website, approximately 100,000 users visited the site (that is, 50,000 visitors a week), while before that time frame, the site averaged only 11,000 visitors per week. [Id. at

2].  Defendant also contends that the Government's operation of the website "actively facilitat[ed] the uploading and distribution of child pornography into the Internet" and "offered thousands of illicit pictures, videos, and links to additional illegal content . . . ."  [Id. at 2-3].  And Defendant contends that the Government "made no attempt to control or curtail the redistribution of any of the Playpen contraband."  [Id. at 3-4].  Relying in part on the Supreme Court decision in United States v. Russell, 93 S. Ct. 1637 (1973), Defendant seeks dismissal of the indictment.[14]

The Government opposes the motion to dismiss noting that every court considering a motion to dismiss on the grounds asserted by Defendant arising out the Playpen investigation has denied the relief of dismissal of the indictment.  [Doc. 65 at 50 n.7].  The Government also contends that since the decision in Russell no Supreme Court decision nor decision in the Eleventh Circuit Court of Appeals has found that circumstances surrounding a government's investigation of criminal activity constitutes outrageous government misconduct resulting in dismissal of an indictment.  [Id. at 48-50].  Finally, relying on the decision in United States v. Costales, 5 F.3d 480 (11th Cir.

_____

[14]Defendant also requests a hearing "to determine the true extent of the harm caused by the Government's investigatory tactics . . . ."  [Id. at 14].  For the reasons set forth *infra*, the court finds that an evidentiary hearing is not necessary to resolve the motion to dismiss.

1993), the Government contends that the FBI's operation of the Playpen website for the limited period of time did not constitute outrageous government misconduct.[15]  [Id. at 51].  For the following reasons, the court recommends denial of the motion to dismiss.

First, the court finds that Defendant has failed to offer any legal authority, under the circumstances as alleged by Defendant, finding that dismissal of the indictment is warranted by the Government's brief operation of the Playpen website.  [Doc. 45].  In fact, as the Government points out, every court to have considered the arguments presented by Defendant has refused to grant a motion dismiss the indictment.  And all but one court has declined to find that the Government's conduct was outrageous.  See Barnes, No. 3:15-CR-112, Doc. 83 at 20 n.14 (listing cases); and see Lueck, No. 6:17-CR-8, Doc. 56 at 7-8 (listing cases).  Second, the Supreme Court's decision in Russell offers Defendant no support.  And, accepting as true Defendant's factual assertions, the court does not find that this case presents "'the extreme circumstances that must exist

_____

[15]The court finds the facts in Costales distinguishable from those before this court based on the Government's account of the government's sting operation in that case. [Id. at 51-52].  While the underlying nature of the operation, conducting a child pornography distribution business and sending such materials by mail, is arguably similar to that under consideration in this case, the scope and potential impact of allowing the Playpen website to operate is significantly different, involving the Internet as contrasted to using the mail, and does not support relying on the decision in Costales to govern the outcome in this case.  That decision will not be addressed further herein.

AO 72A
(Rev.8/82)

before a due process violation will be found:  law enforcement techniques will be deemed unconstitutional only if they violate that fundamental fairness, shocking to the universal sense of justice, mandated by the Due Process Clause of the Fifth Amendment.'"  United States v. Valencia Vergara, 264 Fed. Appx. 832, 834 (11th Cir. 2008) (quoting United States v. Savage, 701 F.2d 867, 868 (11th Cir. 1983)).

The facts in Russell concerned the government's involvement during the investigation of the criminal conduct resulting in an indictment.  These governmental actions facilitated the commission of the crime and allowed the criminal conduct to continue with government assistance, and they supported an entrapment defense at trial. Russell, 93 S. Ct. at 1641-42.[16]  The Supreme Court rejected the defendant's attempt

---

[16]In Russell, an undercover agent was tasked with locating a methamphetamine laboratory believed to be operated by the defendants.  He met with the defendants representing himself as interested in purchasing manufactured methamphetamine and offering to supply a chemical, phenyl-2-propanone ("P2P"), which was necessary to the process and difficult to obtain, on the condition that he first receive a sample of methamphetamine.  The defendants provided the sample.  The defendants revealed that they had been engaged in the manufacture for some time and had produced three pounds of the drug.  The agent subsequently provided P2P for the manufacturing process and observed the defendants manufacturing the drug, receiving a portion of the finished product for sale as previously agreed.  About a month later the agent returned and inquired if the defendants were interested in continuing the arrangement.  The defendants responded affirmatively but indicated that they had sufficient P2P from another source for the time being.  They provided the agent with more methamphetamine.  The next day, agents executed search warrants and arrested the defendants.  93 S. Ct. at 1639-40.

to establish a constitutional violation which would result in dismissal of an indictment "when it is shown that the criminal conduct would not have been possible had not an undercover agent 'supplied an indispensable means to the commission of the crime that could not have been obtained otherwise, through legal or illegal channels.'" Id. at 1642 (citation omitted).

In contrast to the facts in Russell, in this case, "[t]he government did not create the Playpen website, and more importantly did not coerce [Defendant Wheeler] into receiving and possessing child pornography.  The undisputed facts[, see N.D. Ga. Search Warrant Application ¶¶ 25-27,] show that [Defendant Wheeler] willingly joined Playpen several weeks prior to the FBI's allegedly outrageous conduct." United States v. Owens, 2016 WL 7079617, at *5 (E.D. Wis. December 5, 2016) (and as is true in this case, the court concluded that the defendant "is being prosecuted only based on evidence that was found in his residence during a search; the government's conduct in maintaining the Playpen website is far attenuated from the evidence used to prosecute" the defendant); and see Lueck, No. 6:17-CR-8, Doc. 56 at 7 (noting that the "Government did not create Playpen, post any child pornography or any links to child pornography on the website, and did not induce Defendant to possess and download child pornography[,]" instead, the "Government only monitored the Playpen website

32

to obtain identifying information about Defendant and thus had no involvement in Defendant's criminal conduct"); Vortman, 2016 WL 7324987, at *4 ("Vortman's actions in using Playpen to access child pornography were completely voluntary.  The government did not threaten, coerce, or prod him to use Playpen.  In fact, Vortman had already created an account with Playpen and was using the site before the government started its sting operation."); Barnes, No. 3:15-CR-112, Doc. 83 at 21 ("the FBI did not create Playpen, did not alter its functionality, did not actively contribute to its content, and did not actively solicit new members").

Although finding no grounds for dismissal based on the facts in Russell, the Supreme Court noted in dicta that:

> While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction . . ., the instant case is distinctly not of that breed. . . .  The law enforcement conduct here stops far short of violating that "fundamental fairness, shocking to the universal sense of justice," mandated by the Due Process Clause of the Fifth Amendment.

93 S. Ct. at 1643 (citations omitted).  After almost forty years no such case has come before the Supreme Court - nor has any case been dismissed in the Eleventh Circuit Court of Appeals based on a finding of outrageous government misconduct.  See, e.g., Valencia Vergara, 264 Fed. Appx. at 834 (noting that neither the Eleventh Circuit Court

33

of Appeals nor the Supreme Court "has reversed a conviction because of a failure to dismiss a case based on government misconduct"); United States v. Durham, 106 F. Supp. 3d 1301, 1311 (N.D. Ga. 2015) ("Neither the Supreme Court nor the . . . Eleventh Circuit[ ] has ever reversed a case on the ground of outrageous government conduct."). In fact, the Eleventh Circuit Court of Appeals recently stated, "We have never applied the outrageous government conduct defense and have discussed it only in dicta." United States v. Jayyousi, 657 F.3d 1085, 1111 (11th Cir. 2011).  It is apparently questionable whether such a defense is even recognized in the Eleventh Circuit, Id. (the court has "never acknowledged the existence of the outrageous government conduct doctrine"), and if the court had recognized the defense, "the actionable government misconduct must relate to the defendant's underlying or charged criminal acts[,]" Id. at 1111-12 ("'Outrageous government conduct occurs when law enforcement obtains a conviction for conduct beyond the defendant's predisposition by employing methods that fail to comport with due process guarantees.'") (citation omitted).

Defendant Wheeler does not even contend that the allegedly outrageous government misconduct impacted his due process rights or related to his charged criminal conduct, but, instead, he bases his motion on the alleged harm to the victims

34

of child pornography.[17]   [Doc. 45].   However, Defendant cannot rely on allegedly outrageous government misconduct involving or directed at third parties to support his motion.   In <u>United States v. Noriega</u>, 117 F.3d 1206 (11th Cir. 1997), the defendant sought dismissal of the indictment based on the manner by which he was brought before the court, which in that case involved a military invasion of Panama.   In support of his motion, the defendant relied on the alleged mistreatment and harm to Panamanian civilians during the military action.   Rejecting the defendant's reliance on potential or even proven harm to third parties, the Eleventh Circuit Court of Appeals held:

> Further, whatever harm Panamanian civilians suffered during the armed conflict that preceded Noriega's arrest cannot support a due process claim in this case.   <u>See</u> <u>United States v. Payner</u>, [100 S. Ct. 2439, 2447 n.9] (1980) (holding that even where government's conduct toward third parties "was so outrageous as to offend fundamental canons of decency and fairness, the fact remains that [t]he limitations of the Due Process Clause . . . come into play only when the Government activity in question violates some protected right of the *defendant* . . .").

<u>Id.</u> at 1214 (emphasis in original).

---

[17]Defendant's argument is somewhat ironic given that he, without prompting, had accessed the Playpen website, downloaded child pornography and, thereby, furthered the distribution of such materials and victimized the children portrayed in the materials. Unlike Defendant's conduct, at least the Government's investigative operation ultimately sought to protect these victims by identifying and prosecuting users of the website and shutting down the website.

35

Finally, as has been found by other courts considering and rejecting the arguments presented herein, the Government's investigation of the Playpen website and how that investigation was conducted was dictated in large part by how that website operated as a hidden server on the Tor browser and how users, such as Defendant, utilized Tor software to frustrate traditional methods of investigation. On the Tor browser, the IP address and URL for the Playpen website were hidden from typical governmental investigative techniques. (Tr. at 6-10, 12-13). Likewise, the website's users' IP addresses are protected from disclosure by pursuing traditional investigative techniques. (Tr. at 12-13). As the Defendant's expert acknowledged, even after the Government began hosting the Playpen website, there was no way to identify an user's IP address without deploying the NIT. (Tr. at 13-14). Under these circumstances, the court agrees with the magistrate judge's conclusion in Barnes:

> While the FBI's conduct may have been unprecedented as Barnes claims, so was what the FBI faced: the scourge of child pornography, the largest child-pornography website it had ever encountered, the abuse of some of the world' most vulnerable victims, and a vast virtual network hiding perpetrator identities. Upon finding the hard drives, the FBI had to decide: immediately shutdown Playpen and prevent child pornography to the extent the Playpen users could not or would not immediately engage in identical conduct on other dark websites or elsewhere or allow Playpen to continue to operate briefly to try to catch some Playpen users, catch some possible hands-on abusers, save some child victims, and generally deter child-pornography crimes on the dark web or elsewhere. The FBI,

36

as part of the executive branch, was uniquely qualified to make that decision after weighing the costs and benefits. Certainly, the more reprobate the crime, the longer the pause on consideration of government involvement, but that does not support judicial interference into executive decisionmaking to the detriment of combatting [sic] the crime and the benefit of those who would commit it.

Barnes, No. 3:15-CR-112, Doc. 83 at 20-21. Likewise, in United States v. Kim, 2017 WL 394498 (E.D. N.Y. January 27, 2017), the district court noted that the defendant's "due process claim boils down to the contention that the government's conduct was outrageous because the FBI could have accomplished its investigative goals without allowing for the actual distribution of child pornography and the attendant harm to the child victims." Id., at *4. As is true of Defendant Wheeler's argument in this case, that court found that the argument "ignores, or at least gives short shrift to, the well-established deference . . . accorded to law enforcement in determining how to conduct its investigations." Id. (citation and internal quotation marks omitted). This court agrees with the Kim court's conclusion that the "FBI's weighing of the costs and benefits of allowing the Playpen website to remain fully functional during the investigation is precisely the type of difficult decision-making that law enforcement must be allowed to make without undue second-guessing by the judiciary" and that the "decision not to render Playpen, in effect, a dummy website during the investigation,

as Defendant suggests . . ., was one for the FBI, and not the Court or Defendant, to make." Id., at *5.[18]

The facts as alleged by Defendant and established in the record before this court arguably do not demonstrate misconduct, much less misconduct deserving of the extreme sanction of dismissal which is invoked in only the rarest and most outrageous of circumstances.  See, e.g., United States v. Jordan, 316 F.3d 1215, 1249 n.68 (11th Cir. 2003) ("'dismissal of an indictment for prosecutorial misconduct is an extreme sanction which should be infrequently utilized'") (citation omitted); United States v. Nyhuis, 211 F.3d 1340, 1345 (11th Cir. 2000) ("The defense [of outrageous conduct] can be invoked only in the 'rarest and most outrageous circumstances[.]'") (citation omitted).  For these reasons, the court **RECOMMENDS** that Defendant's motion [Doc. 45] to dismiss be **DENIED**.  Defendant's request for an evidentiary hearing is **DENIED**.

---

[18]The court in Kim found persuasive, as does this court, the discussion of this decision-making task by the district courts in United States v. Allain, 213 F. Supp. 3d 236, 253 (D. Mass. 2016), and in Vortman, 2016 WL 7324987, at *5.  See Kim, 2017 WL 394498, at **6-7.

38

## Second Motion to Compel Discovery

On December 1, 2016, Defendant filed a second motion [Doc. 55] to compel discovery seeking several items relating to the Government's use of the Network Investigative Technique, that is, NIT, to obtain IP addresses of and, thereby, identify users of the Playpen website. As noted, due to the Playpen website being located on the Tor browser and because users of the website connected through nodes hiding their IP addresses, deploying the NIT was only means to identify a user's IP address and link that user to access on the website. Defendant contends that in order to test the functioning of the NIT and the reliability of the information returned to the government server logging in the IP address associated with Defendant and the user name, "HellRaiser," additional software information is needed. [Id.]. The Government initially objected to the motion to compel and requested that the court reconsider holding the evidentiary hearing previously scheduled on the motion to suppress and to address the motion to compel. [Doc. 56]. As noted *supra*, the hearing was held, and the Government's request is **DENIED** as **MOOT**. The Government contends that Defendant had sufficient information to determine whether the NIT operated correctly and whether the data collected was properly logged. [Id.].

39

Following the evidentiary hearing, Defendant contends that he is entitled to discovery of two items. Although the Government provided, as requested, the programming command to generate the unique identifier ("UID") inserted into the NIT, Defendant claims that he needs "the software that implemented that command, and inserted the resulting [UID] into the NIT." And, although the Government "provided the log file, the data which the logging server recorded upon receipt," relating to Defendant's case, he claims that he needs "the programming code that actually performed that logging function or made the fail-safe checks." [Doc. 63 at 17-21]. According to Defendant, he needs both programming codes to prepare his defense and to determine whether the affiant[19] for the Northern District of Georgia search warrant

_____

[19]Defendant actually contends that he needs this information "to determine whether the *Government* accurately represented" how the NIT functioned. [Doc. 63 at 17 (emphasis added)]. Even if Defendant was able to show that the NIT did not function as described in his case - highly unlikely given the results of the search warrant, Defendant must also demonstrate that the search warrant affidavit's *affiant* - not just some person in the government - knew or should have reasonably known about any misstatement. See, e.g., Zargari v. United States, 658 Fed. Appx. 501, 506-07 (11th Cir. 2016) (rejecting the defendant's challenge to probable cause in the arrest warrant based on alleged false statements included by the affiant because the affiant pointed out in the affidavit that another officer had witnessed the events recounted and challenged by the defendant; accordingly, "[e]ven if [that officer] knew these events did not take place, his lies cannot support an inference that [the affiant] had any reason to believe that [the officer] was untrustworthy absent plausible factual allegations to that effect"); United States v. Rivera, 524 Fed. Appx. 821, 826 (3rd Cir. 2013) (rejecting the defendant's unsubstantiated contentions in seeking a Franks hearing that the affiant

affidavit accurately represented the functioning of the NIT in order to present a <u>Franks</u>[20] challenge.  [<u>Id.</u> at 17-18].  Defendant contends that this information will allow him to test whether he actually is the Playpen user "HellRaiser" associated with his IP address and to test whether the NIT properly functioned to send information back to the logging server without being intercepted.  [<u>Id.</u>].

In response, the Government argues that Defendant has not established that this information is material to his defense but, instead, relies on conjecture and speculation about what "theoretically might" happen without any evidence that the NIT failed to properly function or that information was not properly delivered and processed by the logging server.  [Doc. 65 at 52-55].  The Government additionally argues that this information is protected by the qualified government privilege to prevent disclosure of law enforcement sensitive information.  [<u>Id.</u> at 55-56].  Defendant's reply does not add

_____

should have questioned the veracity of the informant's information because the defendant "offered no evidence that the detective who provided the affidavit either knew that the information [from the informant] was not true or recklessly disregarded its falsity"); <u>United States v. Jones</u>, 208 F.3d 603, 607 (7th Cir. 2000) ("'[T]he fact that a third party lied to the affiant, who in turn included the lies in a warrant affidavit, does not constitute a <u>Franks</u> violation.  A <u>Franks</u> violation occurs only if the affiant knew the third party was lying, or if the affiant proceeded in reckless disregard of the truth.'") (citation omitted).

[20]<u>See</u> <u>Franks v. Delaware</u>, 98 S. Ct. 2674 (1978).

41

substantially to resolution of the issue before the court.  [Doc. 66 at 16-17].  Because

the court finds that Defendant has not made a showing that the information he seeks is

material to his defense, the court will not address the Government's assertion of

privilege.[21]

> Federal Rule of Criminal Procedure 16(a) provides in pertinent part:
>
> Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:
>
> > (i)  the item is material to preparing the defense;
> > (ii)  the government intends to use the item in its case-in-chief at trial; or
> > (iii)  the item was obtained from or belongs to the defendant.

_____

[21]In United States v. Fernandez, 797 F.2d 943 (11th Cir. 1986), the court similarly did not reach the question of whether the information being sought was privileged because the court found that the defendant did not establish that the information was necessary to his defense.  Id. at 952; and see Garey v. United States, 2010 WL 2507834, at *9 (M.D. Ga. March 29, 2010) ("[T]he Government has a qualified privilege to maintain the confidentiality of the technology and techniques used in investigations as these matters are extremely sensitive and public dissemination would impair future investigations by providing offenders with information to avoid such detection.").

Fed. R. Civ. P. 16(a)(1)(E).  The only provision that is applicable to this case falls within the first category, that is, the items sought by Defendant are material to his defense.

In Jordan, 316 F.3d 1215, the Eleventh Circuit Court of Appeals stated, "An item in the first category need not be disclosed unless the defendant demonstrates that it is material to the preparation of his defense.  A general description of the item will not suffice; neither will a conclusory argument that the requested item is material to the defense. . . .  Rather, the defendant must make a specific request for the item together with an explanation of how it will be 'helpful to the defense.'"  Id. at 1250 (citation omitted).  As the former Fifth Circuit Court of Appeals held, "Materiality means more than that the evidence in question bears some abstract logical relationship to the issues in the case. . . .  There must be some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor."  United States v. Ross, 511 F.2d 757, 762-63 (5th Cir. 1975); and see Jordan, 316 F.3d at 1251 (same); United States v. Mwangi, 2010 WL 690136, at *11 (N.D. Ga. February 18, 2010) (same).  Defendant has not made this showing much less the showing of necessity which would be required to overcome the Government's assertion of privilege.

43

As noted, Defendant seeks the programming code inserting the UID into the NIT and the programming code for the logging server.  As a part of the NIT that the FBI loaded into the Playpen website and then deployed when an user accessed the website, a UID was generated for each unique user to allow the FBI to track each user and link each user with his user name, such as in this case, "HellRaiser," with the IP address that was returned to the logging server.  Defendant was provided with the code that generated the UID but not with the programming code that inserted the UID into each NIT as it was deployed.[22]  (Tr. at 15, 17-21, 62).  Without that code, Dr. Miller contends that he could not test whether the UID was tracked properly in the Playpen software.  (Tr. at 21-22).

Defendant also contends that he requires the software code running on the logging server to ensure that the Internet traffic between the computer receiving the

_____

[22]In this case, because Defendant used the Chrome browser not Tor browser, the NIT was a Javascript sent to his computer and, unlike many cases, an "exploit" was not required to allow the NIT to run on his computer.  (Tr. at 22, 53).  For this reason, although Defendant initially requested the exploit code, the exploit code is not pertinent to his case.  (Tr. at 22-24).  Defendant was provided with the Javascript sent to his computer, and Dr. Miller was able to test how the Javascript functioned.  (Tr. at 25-27).  That test established that the Javascript functioned as the FBI contended, that is, the NIT was delivered to the test computer, containing the UID, and was returned with the correct UID and other information as would have occurred with the FBI's logging server.  (Tr. at 26-29, 45-46).

44

NIT with the UID associated with Defendant's IP address and the FBI's logging server was not "spoofed," that is, intercepted and altered or faked. (Tr. at 29-32, 34-36). Dr. Miller testified that, because the Javascript containing the NIT was not encrypted and because of the type of Internet connection used to return the data to the logging server, it was "possible theoretically" - although "it's very difficult to do" - for such Internet traffic to be intercepted.[23] (Tr. at 31-32). On cross-examination, however, Dr. Miller provided additional qualifiers to this theoretical possibly of spoofing the data package sent from Defendant's computer. He admitted that to be able to spoof the information sent back from Defendant's computer, a person would have to know that the NIT had been sent out and was running and would have to select Defendant's computer to hack. (Tr. at 39-40). And that, although there are individuals monitoring such traffic, he admitted that it was "not very likely" that this occurred. (Tr. at 39-40). Dr. Miller explained, on cross-examination, that he could not determine if there were any flaws in the software running the logging computer and "that a number of mistakes . . . theoretically could have been made." (Tr. at 45). Upon being informed that Defendant had admitted being "HellRaiser" who had visited the Playpen website and that agents

---

[23]Dr. Miller received all of the data logged on the logging server related to Defendant's IP address and UID assigned to that address. (Tr. at 34-35).

45

had discovered thousands of images of child pornography on his computer, Dr. Miller conceded that it would make it even "less likely that [Defendant] was spoofed" or that there were flaws in the logging data.[24]  (Tr. at 40-41, 46).  Nonetheless, Dr. Miller testified that, if he had the programming code used to complete the logging function, he could confirm the accuracy of the logging data he was provided.  (Tr. at 35-36, 44-45).

Quite frankly, without even considering the testimony of Agent Alfin, as is true of other courts that have considered Dr. Miller's testimony or sworn affidavit on these very points, the court finds that Defendant Wheeler "has not made a showing of materiality sufficient to obtain the discovery he seeks."  Owens, 2016 WL 7351270, at *4 (listing cases).  And consideration of the agent's testimony further undermines any showing of materiality as regards the additional software coding information.

_____

[24]Defendant argues that this information is not relevant to the motion to compel. [Doc. 63 at 18].  However, his statement and the evidence found in his residence, which this court has recommended be admitted at trial, is pertinent to the question whether these programming codes are necessary to Defendant's defense, that is, just how likely is it, if Defendant receives the information, that he will be able to show a flaw in the data linking him to Playpen.  See United States v. Owens, 2016 WL 7351270, at *6 (E.D. Wis. December 19, 2016) (relying in part on the defendant's admissions that had accessed the Playpen website and that the government had found child pornography on his computer to deny the request for the same type of programming code sought by Defendant Wheeler).

AO 72A
(Rev.8/82)

With respect to the programming code for inserting the UID into the NIT, Agent Alfin testified that Dr. Miller was given the UID code for Defendant's case and that the report prepared by Dr. Miller shows the UID was inserted into the NIT, "[s]o it is apparent that it was put in there properly."  (Tr. at 56-57).  And, with respect to the potential for spoofing the Internet traffic from the Playpen website to a computer receiving a NIT, the agent testified that that traffic is over the encrypted Tor browser and would require a person attempting to intercept the transmission to know about the FBI investigation, to know the UID was generated for the NIT, to know Defendant's true IP address and to know the IP address of the FBI's logging server and would require "the capability to intercept and alter that data in a matter of seconds."  (Tr. at 57-58).  According to Agent Alfin, "There is no person, organization or entity who could have known all these things who could have had that capability."  (Tr. at 58). Additionally, as the agent stated, due to the results of the investigation, it is evident that the NIT functioned successfully and that the logging server captured accurate information. (Tr. at 58). On cross-examination, the agent was asked about the potential for intercepting the unencrypted Internet packets returned to the FBI server.[25]  The

---

[25]Defendant apparently concedes the impossibility of intercepting the Tor browser traffic from the Playpen website to the user's computer.

agent did not agree that such Internet traffic was easier to spoof.  He stated that anyone

intercepting the traffic from a computer to the logging server "would need certain tools

and skills . . . ." (Tr. at 73).  When questioned if someone with appropriate knowledge

could just be monitoring unencrypted, unprotected Internet traffic and observe a packet

going back to the logging server, not being aware at all about the FBI investigation or

any particular user, and then intercept the packet, observe the UID and IP and alter the

contents before sending the packet on to the logging server, Agent Alfin responded that

theoretically or in theory that could happen.  (Tr. at 74-75).  But he continued to explain

that such an occurrence would be detected because, during the course of the

investigation, the same UID, linked to a username, would be linked to two IP addresses.

The data on the logging server is reviewed and analyzed, although not in real time, and

that never happened.  (Tr. at 76).  Also, in examining the data that was received by the

logging server, Agent Alfin testified that "clearly it would take some time for someone

to capture this data, break it down, look at it, see how's formatted and retool it for their

own purposes . . . ." (Tr. at 78-79).  The reports for the logging server show when the

NIT was deployed and the information received back in the logging server - for

example, for Defendant Wheeler this transmission and return occurred within seconds -

was not delayed to allow time for an interception to occur.  (Tr. at 79-80).  With respect

48

to the logging server, the agent testified that Defendant received all of the information on the server pertaining to him, including, his IP address, the UID and the timestamp reflecting when the server received the information. (Tr. at 59-60, 80-81).

The court also notes that there is no evidence, even in light of the large number of Playpen cases prosecuted, of any claim of actual improper functioning of the coding being sought by Defendant or that any incorrect or false or spoofed information was received by the logging server resulting in a defendant being wrongfully associated with the Playpen website. Considered in light of Defendant's evidence of only a "theoretical" possibility of such an occurrence, his evidence "fall[s] well short of showing that there is any non-speculative possibility that he was the victim of" hacking or spoofing - his theories "suffer[ ] from a complete lack of corroboration." Owens, 2016 WL 7351270, at *5. In Owens, the defendant sought the NIT source code to test whether the NIT ran as the government stated in the search warrant application; however, the court noted, as is true in this case, that Dr. Miller had already tested the NIT and "concluded that the program operated consistently with the government's representations." Id., at **4-5. And, as in this case, Defendant "offers no more than speculation that he requires the remainder" of the NIT code. Id., at *5. Further, in Owens, as in this case, the defendant was provided with the data stream between his

49

and the FBI computer but still contended that he needed "collection server software" to evaluate the chain of custody. Id. The district court agreed with the magistrate judge's rejection of this request because the defendant could observe that the "entire extraction process took about one second, so it is highly unlikely that the information was tampered with while in transit." Id. (citation and internal quotation marks omitted). The same conclusion applies in this case.

As the court in Owens stated, "It is not enough for [Defendant] to say merely that hacking could have occurred, for this does not convincingly explain how his requested discovery would significantly help him develop his defense." Id.; and see United States v. Matish, 193 F. Supp. 3d 585, 599 (E.D. Va. 2016) ("Notably, the purposes for which Defendant asks for access to the missing source code [for the logging computer] are based upon speculation as to what declarants might find. The defense lacks any evidence to support the hypotheses and instead relies upon the *ipse dixit* that the source code is needed because its declarants opine that it is needed. Such speculation remains insufficient to serve as a basis to compel discovery.").[26]

---

[26]In Matish, the defendant relied on the same arguments as presented herein to obtain the logging server's software, that is, the Internet traffic from his computer to the logging computer was not encrypted and that this traffic was vulnerable to tampering. The court noted that Agent Alfin testified, as in this case, that the data stream was transferred in seconds requiring in depth knowledge of the Playpen

In conclusion, the court finds that Defendant is seeking information that is not material to his defense because he fails to establish "some indication that the pretrial disclosure of the disputed evidence would . . . enable[ ] [him] significantly to alter the quantum of proof in his favor." Ross, 511 F.2d at 762-63.  For these reasons, the court **DENIES** the second motion [Doc. 55] to compel discovery.

## Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motion [Doc. 45] to dismiss and motion [Doc. 46] to suppress be **DENIED** and **ORDERS** that Defendant's request [Doc. 45] for an evidentiary hearing on his motion to dismiss and that Defendant's motion [Doc. 55] to compel discovery be **DENIED** and that the Government's motion [Doc. 56] to reconsider holding the evidentiary hearing on the motions to suppress and compel discovery be **DENIED** as **MOOT**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

---

investigation to be able to complete the "hacking operation" within that time frame, by implication, a highly unlikely event.  Id. at 599-600.

51

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**IT IS SO ORDERED and RECOMMENDED**, this 12th day of June, 2017.


JANET F. KING
UNITED STATES MAGISTRATE JUDGE

52